**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JACQUELINE CRAINE,

Plaintiff,

v.

CBOE GLOBAL MARKETS, INC.,
433 W Van Buren St
Chicago, IL 60607,

Defendant.

Case No. 2:26-cv-2046

## COMPLAINT

Plaintiff Jacqueline Craine ("Craine" or "Plaintiff"), for her Complaint against Defendant Cboe Global Markets, Inc. ("Cboe" or "the Company" or "Defendant"), states and alleges as follows:

## NATURE OF THE CASE

1. Cboe Global Markets, Inc. is a publicly traded derivatives and exchange network that owns the Chicago Board Options Exchange and the BATS Global Markets stock exchange. Jacqueline Craine was employed by Cboe as a Lead Auditor with specialized expertise in the evaluation of internal controls over financial reporting to ensure its accuracy and to prevent fraud. **After Ms. Craine raised grave concerns to Cboe leadership regarding systemic accounting and operational control issues that could fraudulently overstate Cboe's performance to its benefit without shareholder knowledge, she was the victim of retaliation, and her employment was terminated without notice or cause.** Ms. Craine now brings this action pursuant to the anti-retaliation protections under the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1541A ("SOX"), the

Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 ("FMLA"), and the common law of the State of Kansas.

## PARTIES

2. Plaintiff Jacqueline Craine is a resident of the State of Kansas. Plaintiff was employed by Defendant. Plaintiff was also an employee of Defendant as that term is defined under 18 U.S.C. 1541A on the basis that she is an individual presently or formerly working for a publicly traded person and covered person. 29 C.F.R. § 1980.101(g).

3. Defendant Cboe Global Markets, Inc. is a for-profit corporation organized under the laws of the State of Delaware. Defendant is a publicly traded company and covered person as those terms are defined under 18 U.S.C. 1541A on the basis that it has a class of securities registered under Section 12 of the Securities Exchange Act and it is required to file reports under Section 15(d) of that Act. 29 C.F.R. § 1980.101(d) and (f).

4. At all times relevant herein, each of the officers, agents, and employees of Defendant identified herein were acting within the course and scope of their employment with Defendant.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this cause of action pursuant to 28 U.S.C. §§ 1331 and 1337.

6. Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action. A timely SOX Complaint was filed with the United States Department of Labor ("DOL") Occupational Safety & Health Administration ("OSHA") on May 19, 2025. A copy of Plaintiff's SOX Complaint is attached hereto and incorporated by reference as Exhibit A. SOX permits a complainant to bring a SOX action in federal court seeking a de novo review if the DOL has not reached a final decision on the Complaint within 180 days of the filing of the

complaint with OSHA and the delay is not due to the bad faith of complainant. The DOL has not reached a final decision on the merits of Plaintiff's SOX claim, and the 180-day period following the filing of Plaintiff's FSMA claim has expired.

7. The United States District Court for the District of Kansas has personal jurisdiction over Defendant inasmuch as Defendant conducts business within this District.

8. The unlawful employment practices alleged herein were committed within this jurisdiction.

9. Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as Defendant has offices, conducts business, and/or can be found in the District of Kansas, and the cause of action set forth herein has arisen and occurred in substantial part in this district. Venue is also properly laid in this Court pursuant to 29 U.S.C. § 1132(e)(2) because Defendant has substantial business contacts within the State of Kansas.

## SOX WHISTLEBLOWER PROTECTIONS

10. SOX protects employees from discharge or other retaliation by their employers for raising good faith concerns regarding any rule or regulation of the Securities and Exchange Commission. It specifically provides:

> **§1514A. Civil Action to protect against retaliation in fraud cases**
>
> **(a)** **Whistleblower protection for employees of publicly traded companies.** – No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)) including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer, employee, contractor, subcontractor, or agent of such company or nationally

recognized statistical rating organization, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee –

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by –

(A) a Federal regulatory or law enforcement agency;

(B) any Member of Congress or any committee of Congress; or

(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

(2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

**(b) Enforcement action.**

(1) **In general.** – A person who alleges discharge or other discrimination by any person in violation of subsection (a) may seek relief under subsection (c), by –

(A) filing a complaint with the Secretary of Labor;

(B) if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant, bringing an action at law or equity for de novo review in the appropriate district court of the United

States, which shall have jurisdiction over such an action without regard to the amount in controversy.

…

**(c) Remedies.**

(1) In general. – An employee prevailing in any action under subsection (b)(1) shall be entitled to all relief necessary to make the employee whole.

(2) Compensatory damages. – Relief for any action under paragraph (1) shall include –

(A) reinstatement with the same seniority status that the employee would have had, but for the discrimination;

(B) the amount of back pay, with interest; and

(C) compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.

**(d) Rights retained by employee.** – Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any Federal or State law, or under any collective bargaining agreement.

11. Regulations governing the enforcement of provisions of protecting SOX employees from discharge or other retaliation by their employers for raising good faith concerns regarding any rule or regulation of the Securities and Exchange Commission provide in relevant part:

…

**29 C.F.R. § 1984.104 Investigation.**

…

(e)(2) The complaint, supplemented as appropriate by interviews of the Plaintiff, must allege the existence of facts and evidence to make a prima facie showing as follows:

(i) The employee engaged in a protected activity;

(ii) The Defendant knew or suspected that the employee engaged in the protected activity;

(iii) The employee suffered an adverse action; and

(iv) The circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action.[1]

(e)(3) For purposes of determining whether to investigate, the Plaintiff will be considered to have met the required burden if the complaint on its face, supplemented as appropriate through interviews of the Plaintiff, alleges the existence of facts and either direct or circumstantial evidence to meet the required showing, *i.e.*, to give rise to an inference that the Defendant knew or suspected that the employee engaged in protected activity was a contributing factor in the adverse action. The burden may be satisfied, for example, if the Plaintiff shows that the adverse action took place shortly after the protected activity. If the required showing has not been made, the Plaintiff (or the Plaintiff's legal counsel if Plaintiff is represented by counsel) will be so notified and the investigation will not commence.

**<u>FACTS</u>**

12. Plaintiff Jacqueline Craine was employed by Defendant Cboe Global Markets as a Lead Auditor from March 20, 2022, until the termination of her employment on January 30, 2025. Ms. Craine reported directly to Director of Internal Audit Michael Werling at the time her employment was terminated.

[1] In *Murray v. UBS Securities, LLC*, 144 S.Ct. 445 (2024), the United States Supreme Court held that "[w]hen an employer treats someone worse – whether by firing them, demoting them, or imposing some other unfavorable change in the terms and conditions of employment – 'because of' the employee's protected whistleblowing activity, the employer violates § 1514A." *Id.* 453. "The burden shifting framework provides a means of getting at intent, and Congress here has decided that the plaintiff's burden on intent is simply to show that the protected activity was a 'contributing factor' in the unfavorable personnel action." *Id.* at 454 (citing 49 U.S.C. § 42121(b)(2)(B)(i)). The Court held further that:

> To be sure, the contributing factor framework that Congress chose here is not as protective of employers as a motivating factor framework. That is by design. Congress has employed the contributing factor framework in contexts where the health, safety, or well-being of the public may well depend on whether whistleblowers feeling empowered to come forward. This Court cannot override that policy choice by giving employers more protection than the statue itself provides.

*Id.* at 456.

13. Soon after her employment began, Ms. Craine began to identify and raise concerns that informed her reasonable beliefs that Cboe was engaged in conduct that constituted securities fraud, shareholder fraud, and/or violations of SEC rules and regulations.

14. As a Lead Auditor, Ms. Craine was charged with organization-wide SOX compliance testing, utilizing a series of internal and external controls to audit and verify the integrity of Cboe's financial reporting. Ms. Craine observed that many of her findings and observations memorialized as part of these efforts were neither included in final SOX reports nor disclosed to external auditors. She was the victim of retaliation in numerous forms, and her employment was terminated in retaliation for raising these findings, observations, and concerns.

**SOX SECTION 302 – CORPORATE RESPONSIBILITY FOR FINANCIAL REPORTS**

15. SOX Section 302 provides that the CEO and CFO are directly responsible for the accuracy, documentation and submission of all financial reports and the internal control structure to the SEC.[2] It provides in relevant part:

> (a) The Commission shall, by rule, require, for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m, 78o(d)), that the principal

---

[2] The Cboe 2023 annual Form 10-K at pp. 49 notes that "[o]ur ability to comply with applicable laws and rules is largely dependent on the establishment and maintenance of appropriate systems and procedures." The Cboe annual form 10-K at pp. 52 also notes that:

> We maintain risk management, compliance and monitoring policies, procedures and programs that are reasonably designed to help with our compliance with applicable laws and rules and to prevent, detect, deter, monitor and manage our risks, including enterprise risk, compliance, regulatory, and internal audit programs, but such policies, procedures and programs may not be fully effective in their operation. Further, we face the risk of intervention by regulatory authorities, including extensive examination and surveillance activity. In the case of actual or alleged non-compliance with applicable laws or regulations, we could be subject to investigations and judicial or administrative proceedings that may result in penalties, settlements or civil lawsuits, including by customers, or third parties, for damages, which may be substantial. For example, the SEC has previously brought actions against exchange operators, including us, for failing to fulfill their obligations to have an effective regulatory system. Any failure to comply with applicable laws and rules could materially adversely affect our business, reputation, financial condition and operating results and, in extreme cases, our ability to conduct our business or portions thereof.

https://d18rn0p25nwr6d.cloudfront.net/CIK-0001374310/11f5056f-e94e-4fdc-9cbf-a866d1c729d8.pdf

executive officer or officers and the principal financial officer of officers, or persons performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that –

(1) the signing officer has reviewed the report;

(2) based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;

(3) based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

(4) the signing officers:

(A) are responsible for establishing and maintaining internal controls;

(B) have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;

(C) have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report;

(D) have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date;

(5) the signing officers have disclosed to the issuer's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function) –

(A) all significant deficiencies in the design or operation of internal control which could adversely affect the issuer's ability to record, process, summarize, and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

(B) any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

(6) the signing officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

16. In her role as a Lead Auditor, Ms. Craine raised concerns related to general failures to comply with Generally Accepted Accounting Principles ("GAAP") in ways that jeopardized the accuracy of Cboe financial reports. As part of 2023 SOX testing conducted in January 2024, Ms. Craine observed that a significant number of recorded assets were recorded below defined capitalization thresholds. Ms. Craine raised her concerns by email to her colleagues on the financial team, including the then Controller Allen Wilkinson, explaining that multiple assets had been created for costs related to a single asset. Ms. Craine raised concerns regarding the potential impact or misstatement of general ledger accounts to Chief Audit Executive ("CAE") Jim Enstrom and explained that determining the amount of misstatement required a comprehensive audit of all assets. As a result, Mr. Enstrom determined instead that her observations were immaterial and should therefore be considered an enhancement. When Ms. Craine later raised the same concerns with Vice President of Internal Audit Heidi Zenger, and she explained that in her view Ms. Craine's observation should instead be characterized as a finding rather than an enhancement. Nevertheless, Mr. Enstrom elected to characterize the reporting issues she had identified as immaterial.

17. The concerns raised by Ms. Craine related to the inaccurate recording of assets below defined capitalization thresholds remained unresolved at the time of the termination of Ms. Craine's employment.

18. As part of the same 2023 SOX testing conducted in January 2024, Ms. Craine also observed that multiple payroll-related subcategories incorrectly overlapped across multiple general ledger accounts. For example, Ms. Craine encountered difficulties in distinguishing short

term incentive accruals from other bonus-related transactions and observed numerous discrepancies in related spend categories. Ms. Craine raised concerns on these subjects to her colleagues on the finance team and recommended a review of all spend and revenue categories to make certain they were appropriately aligned between Workday, a cloud-based financial management application, and TM1, an analytical processing database. She also recommended that spend and revenue categories should be required for all accounting entries. Her concerns and recommendations were dismissed. Instead, she was informed that Cboe "does not report financial data at that level of detail" and elected to characterize her observations as an enhancement.

19. The concerns raised by Ms. Craine related to duplicate spend categories on the general ledger remained unresolved at the time of the termination of Ms. Craine's employment.

20. In her role as a Lead Auditor Ms. Craine also observed that Cboe failed to adopt formal financial policies and procedures for business units located outside the United States. A treasury audit conducted from August 2023 through July 2024 identified serious deficiencies in this regard, including the absence of critical financial policies and procedures for foreign subsidiaries in Australia, Canada, Hong Kong, Japan, the Philippines, and Singapore. [3]

21. Ms. Craine informed CAE Jim Enstrom that the absence of formal financial policies and procedures for business units located outside the United States could lead to inconsistent and often erroneous financial reporting. Ms. Craine offered on numerous occasions to assist the finance department in developing formal financial policies and procedures of this type given her substantial experience with internal controls and financial reporting obligations. She also

---

[3] The Cboe 2023 annual Form 10-K at pp. 43 notes that "[I]n addition to our operations in the U.S., we have operations in the UK, continental Europe, Canada, Hong Kong, Australia, Japan, Philippines, and Singapore. In connection with our expanded global operations, we face certain risks inherent in doing business globally."
https://d18rn0p25nwr6d.cloudfront.net/CIK-0001374310/11f5056f-e94e-4fdc-9cbf-a866d1c729d8.pdf

expressed her concern to Mr. Enstrom that the financial department was "still operating like a small US company and not a global company."

22. The concerns raised by Ms. Craine related to the absence of formal policies and procedures for business units located outside the United States remained unresolved at the time of the termination of Ms. Craine's employment.

23. During a Treasury Adiut conducted in May 2024 of business units outside the United States, Ms. Craine also identified several incomplete or missing bank and general ledger account reconciliations totaling more than $48M. Ms. Craine raised concerns on this subject with Senior Vice President of International Finance Stephanie Renner, who explained that the reconciliations had been completed manually instead. Ms. Craine thereafter was unable to verify the existence or accuracy of the manual bank reconciliations, and Ms. Renner later explained that Workday lacked the functionality for manual reconciliations, a claim that Ms. Craine explained on numerous occasions was untrue.

24. The concerns raised by Ms. Craine related to incomplete or missing bank and general ledger account reconciliations remained unresolved at the time of the termination of Ms. Craine's employment.

25. As part of the same Treasury Audit, Ms. Craine also reviewed the balance sheet accounts to ensure the completion of appropriate account certifications. After she reported to her colleagues her concerns that the certifications had not been completed, members of the finance team explained that "non-cash general ledger account certifications were not part of treasury functions" and that they "should not have been included in the audit scope." When Ms. Craine investigated the issue further, she learned that the rules requiring account certifications had not been correctly applied to numerous general ledger accounts.

26. The concerns raised by Ms. Craine related to incomplete account certifications remained unresolved at the time of the termination of Ms. Craine's employment.

27. In her role as Lead Auditor, Ms. Craine also observed inaccuracies in financial reporting related to significant overbilling for numerous Cboe customers.[4] Ms. Craine learned that billing software issues had been identified during previous SOX audits that remained unresolved through the 2024 SOX audit, and that overbilling inaccuracies totaling millions of dollars would apparently continue to remain unresolved for Cboe customers. In a SOX call in July 2024 with members of Cboe leadership, numerous senior KPMG representatives raised concerns that Cboe leadership had failed in their modest efforts to remediate the ongoing billing software issues. After the call, Ms. Craine contacted Chief Accounting Officer Allen Wilkinson to offer her assistance in reviewing and developing additional billing controls. He dismissed her concerns and insisted instead that it was not an audit responsibility to resolve the billing inaccuracies.

28. Ms. Craine then contacted Controller Casie Harris to discuss solutions for the billing inaccuracies and to again offer her assistance in reviewing and developing additional billing controls. Ms. Craine's offers to assist were declined. The finance team delegated responsibility

---

[4] The Cboe 2023 annual Form 10-K at pp. 43 notes that:

> We must continually improve our operational, billing, financial and regulatory systems and managerial controls and procedures, and may need to continue to expand, train and manage our workforce. We must also maintain close coordination among our technology, legal, accounting, finance, marketing, sales, regulatory and compliance functions. If we fail to manage our growth effectively, our business, financial condition and operating results could be materially harmed. **For example, from time to time we discover and remediate billing errors, however, we are not aware of any of these errors having a material impact on our business, financial condition or operating results to date, however we cannot assure you that we will not experience future errors or events that may be material or result in additional regulatory scrutiny**.

https://d18rn0p25nwr6d.cloudfront.net/CIK-0001374310/11f5056f-e94e-4fdc-9cbf-a866d1c729d8.pdf

for resolution of the billing inaccuracies to Lead Accountant April Feller. Ms. Feller resigned in December 2024 citing disputes with management on this subject as the basis for her resignation.

29. The concerns raised by Ms. Craine related to substantial unresolved billing inaccuracies for Cboe clients remained unresolved at the time of the termination of Ms. Craine's employment.

**<u>SOX SECTION 404 – MANAGEMENT ASSESSMENT OF INTERNAL CONTROLS</u>**

30. SOX Section 404 provides that all financial reports must include an Internal Control Report stating that management is responsible for an adequate internal control structure, and an assessment by management of the effectiveness of the control structure. Any shortcomings in these controls must also be reported. In addition, registered external auditors must attest to the accuracy of the company management assertion that internal accounting controls are in place, operational, and effective. It provides in relevant part:

> (a) The Commission shall prescribe rules requiring each annual report required by section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)) to contain an internal control report, which shall –
>
> > (1) state the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and
> >
> > (2) contain an assessment, as of the end of the most recent fiscal year of the issuer, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting.
>
> (b) INTERNAL CONTROL EVALUATION AND REPORTING. – With respect to the internal control assessment required by subsection (a), each registered public accounting firm that prepares or issues the audit report for the issuer shall attest to, and report on, the assessment made by the management of the issuer. An attestation made under this subsection shall be made in accordance with standards for attestation engagements issued or adopted by the Board. Any such attestation shall not be the subject of a separate engagement.

31. In her role as a Lead Auditor Ms. Craine also observed significant control weaknesses directly affecting Cboe financial reporting. For example, soon after she joined the organization, Ms. Craine observed that Cboe internal audit testing methods generally were not undertaken for the purpose of meaningful evaluation of operational controls. Instead, individuals involved in these efforts simply verified their purported review of relevant financials without a necessary verification of the accuracy of the data utilized in their evaluation. Ms. Craine routinely observed inconsistency in accounting methods used for investment transactions due to the absence or insufficiency of investment policy guidelines, duplicate supplier records without processes utilized to track or verify contract spends, and inadequate tracking of supplier payments as they related to budgeted expenses.

32. Ms. Craine also observed an organization-wide lack of sufficient business process analytics during her tenure with Cboe. For example, Ms. Craine regularly assisted Internal Audit Data Analyst Garrett Smith with the development of relevant criteria for multiple finance-related data analytics efforts. When Ms. Craine insisted that data analytics efforts with which she had assisted must be shared openly with members of the finance team, Cboe management purposefully restricted access to the results of internal audit data analytics projects notwithstanding the plain benefit of their collective analysis to her colleagues.

33. The concerns raised by Ms. Craine related to the absence of adequate internal control structure and insufficient assessments by Cboe management of the effectiveness of the organization's control structure remained unresolved at the time of the termination of Ms. Craine's employment.

**RETLAIATION AGAINST PLAINTIFF AND THE TERMINATION OF PLAINTIFF'S EMPLOYMENT**

34. During a preliminary treasury audit closing discussion in July 2024, senior members of the finance team leadership disagreed with Ms. Craine's observations regarding medium risk ratings for various issues as part of recent auditing evaluations. These individuals included Senior Vice President of International Finance Stephanie Renner and Chief Accounting Officer Allen Wilkinson. Senior members of the finance team leadership argued that the audit findings of Ms. Craine and her colleagues were immaterial and should be characterized as low risk instead. Citing her substantial experience with internal controls, Ms. Craine disagreed with their alternative risk assessments. Ms. Craine was thereafter instructed by CAE Jim Enstrom and Senior Director of Internal Audit Timothy Ahlborn to rewrite her findings. Though she reluctantly did so, senior members of the finance team leadership continued to dispute the legitimacy of her observations and conclusions. After Ms. Craine reluctantly agreed to rewrite her findings a second time, she insisted to Mr. Ahlborn that "changing the wording doesn't change the facts."

35. Following these discussions and the concerted efforts from members of the finance team leadership to diminish her observations and conclusions as part of the preliminary treasury audit closing, Ms. Craine reported to Chief Risk Officer Tony Furney her concerns that the insufficiency or absence of preventive controls on subjects about which they had already spoken could result in a material financial misstatement.

36. In August 2024 Ms. Craine met with Executive Vice President of Human Resources Stephanie Foley. Ms. Craine explained generally her concerns regarding the systemic accounting and operational control issues she had raised with members of Cboe Audit and Finance leadership and her concern about potential retaliation. Ms. Craine asked Ms. Foley whether she had an obligation, ethical or otherwise, to report her concerns regarding accounting and operational

control issues to Cboe leadership. In response, Ms. Foley explained that she had an independent reporting obligation on these subjects and that Cboe company policy required Ms. Craine to cooperate in an investigation of the issues that she had raised. Ms. Craine agreed to cooperate in any investigation as necessary.

37. On or about September 4, 2025, Ms. Craine participated in an initial internal interview with Executive Vice President of Human Resources Stephanie Foley and members of Cboe inside legal counsel during which Ms. Craine expressed again her concerns regarding the systemic accounting and operational control issues she had raised with members of Cboe leadership and her concern about potential retaliation. In a follow-up meeting Ms. Foley explained that that Cboe leadership had referred the investigation of her claims to outside legal counsel due to the "complex nature" of her claims. Ms. Foley then described Cboe whistleblower policy generally and informed Ms. Craine that she was "required to cooperate during the investigation." She added "there will be no retaliation for claims made in good faith" and added that she had no doubt that Ms. Craine's claims had in fact been made in good faith.

38. Days later Ms. Craine learned that the investigation of her concerns regarding the systemic accounting and operational control issues she had raised with members of Cboe leadership and her concern about potential retaliation had been referred to outside counsel King & Spaulding LLP. On September 26, 2025, Ms. Craine met in Chicago with a group of King & Spaulding attorneys at Cboe's request.

39. In November 2024 Ms. Craine virtually participated in additional interviews with King & Spaulding attorneys to discuss the systemic accounting and operational control issues she had raised with members of Cboe leadership and her concern about potential retaliation. The inquiries during these subsequent interviews focused instead upon Ms. Craine's audit practices

generally and not upon the issues she had raised to members of Cboe leadership and Ms. Foley. The attorneys with whom she met did not inquire further about Ms. Craine's audit observations or the systemic accounting and operational control issues she had raised with members of Cboe leadership.

40. On December 27, 2024, Ms. Craine received an email and letter from the King & Spaulding attorneys with whom she had met as part of the investigation explaining that they had found no evidence of wrongdoing. Ms. Craine did not speak further with Vice President of Human Resources Stephanie Foley or members of Cboe leadership on these subjects.

41. On January 6, 2025, members of the Cboe internal audit team were informed that Ms. Craine's supervisor Director of Internal Audit Michael Werling intended to retire from Cboe in March 2025.

42. After Ms. Craine learned of Mr. Werling's unexpected departure, Ms. Craine contacted Senior Director of Internal Audit Tim Ahlborn to inquire whether Mr. Werling would still be charged with conducting her year-end performance appraisal. Mr. Ahlborn responded that he would conduct the performance evaluation instead. Ms. Craine received a calendar invite to participate in her performance evaluation on January 16, and the meeting was subsequently postponed to January 30. On January 30, Ms. Craine received another email informing her that her annual performance appraisal had been postponed to February 3.

43. On the morning of January 30, Ms. Craine received a Microsoft Teams chat message from CAE Jim Enstrom asking about her availability to meet via Teams. Immediately following Mr. Enstrom's request to meet, Ms. Craine met with Mr. Enstrom and Human Resources Manager Nikita Lawrence. Ms. Craine participated in the meeting from her home in the general proximity of her husband, David Craine, and her mother, Lynn Carver. During the meeting Ms.

Lawrence explained that the meeting was confidential and would not be recorded. Ms. Craine was then informed that her year-end performance evaluation would be characterized as "expects to see more" and that, as a result, she would not be eligible to receive an annual performance bonus. Ms. Craine then said "this is retaliation" and suggested that perhaps she should instead resign her employment. She then said "I take that back, I'm not resigning, I'm going to hire a lawyer." Because she had days before initiated a request for an absence from work for the purpose of her evaluation and treatment for an FMLA leave of absence related to a recent chest trauma, she ended the meeting by explaining that she abruptly ended the call when she felt lightheaded and experienced difficulty in breathing.

44. Minutes later she attempted to log in to the Cboe network to access her work email and learned that it had been disabled. She instead sent an email from her personal email address to Executive Vice President of Human Resources Stephanie Foley informing her that she sought a medical leave of absence related to a recent chest trauma. That afternoon Ms. Craine received an email request informing her that her request for a medical leave of absence was denied because she was "no longer an employee."

**COUNT ONE – RETALIATION IN VIOLATION OF 18 U.S.C. 1514A**

45. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

46. Plaintiff was an employee of Defendant.

47. Defendant is vicariously liable for the actions of their employees and agents.

48. Defendant is a publicly traded company as that term is defined under the Sarbanes-Oxley Act of 2002, 18 U.S.C. 1541A on the basis that it has a class of securities registered under Section 12 of the Securities Exchange Act and it is required to file reports under Section 15(d) of that Act.

49. Plaintiff engaged in protected activities and conduct by raising numerous concerns to Defendant's leadership regarding systemic accounting and operational control issues that could fraudulently overstate Defendant's performance to its benefit without shareholder knowledge. These concerns substantiated Plaintiff's reasonable belief that these practices were in contravention of SEC regulations and constituted a violation of federal anti-fraud statutes, rules or regulations of the Securities and Exchange Commission, and/or federal law relating to fraud against shareholders.

50. Defendant and its agents knew that Plaintiff engaged in a protected activity or conduct by raising numerous concerns to Defendant's leadership regarding systemic accounting and operational control issues that could fraudulently overstate Defendant's performance to its benefit without shareholder knowledge. Defendant and its agents also knew that these concerns substantiated Plaintiff's reasonable belief that these practices were in contravention of SEC regulations and constituted a violation of federal anti-fraud statutes, rules or regulations of the Securities and Exchange Commission, and/or federal law relating to fraud against shareholders.

51. Plaintiff suffered unfavorable personnel actions when she was informed that she would not be eligible to receive an annual performance bonus and when her employment was terminated on January 30, 2025.

52. The reasons cited by Defendant for the determination that Plaintiff would not be eligible to receive an annual performance bonus and for the termination of Plaintiff's employment constitute pretext for unlawful discrimination and retaliation against Plaintiff because she engaged in a lawful act by raising numerous concerns to Defendant's leadership regarding systemic accounting and operational control issues that could fraudulently overstate Defendant's performance to its benefit without shareholder knowledge.

53. The circumstances as described herein are sufficient to raise the inference that Plaintiff's protected activity was a contributing factor in Defendant's decision to terminate Plaintiff's employment.

54. As a direct and proximate result of Defendant's actions, Plaintiff has been deprived of income and other monetary and non-monetary benefits.

55. As a further direct and proximate result of Defendant's actions, Plaintiff has suffered humiliation, emotional pain, distress, suffering, inconvenience, mental anguish, reputational harm, and related non-economic damages for which she is entitled from Defendant as damages.

56. Plaintiff is further entitled to all relief necessary to make her whole, including but not limited to reinstatement with the same seniority status or front-pay in lieu of reinstatement and back pay with interest, as provided in 18 U.S.C. 1541A(c).

57. Plaintiff is further entitled to recover from Defendant any and all special damages, litigation costs, expert witness fees, and her reasonable attorneys' fees, as provided in 18 U.S.C. 1541A(c).

WHEREFORE, Plaintiff prays for judgment against Defendant on Count One of her Complaint, for a finding that she has been subjected to unlawful retaliation in violation of SOX; for an award of back pay, including lost fringe benefits, bonuses, costs of living increases and other benefits including interest; for an award of front pay in a reasonable amount; for an award of compensatory damages, including those for emotional pain and distress and reputational harm; for her costs expended; for her reasonable attorney's and expert witness fees; and for such other and further relief the Court deems just and proper.

**COUNT TWO – WRONGFUL TERMINATION IN VIOLATION OF THE PUBLIC POLICY OF THE STATE OF KANSAS**

58. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

59. Plaintiff reported to her supervisors what she in good faith and reasonably believed to be unlawful ongoing violations of standards governing securities fraud, shareholder fraud, and/or violations of SEC rules and regulations.

60. The Kansas legislature's adoption of standards governing securities and/or shareholder fraud is embodied in the Kansas Uniform Securities Act, K.S.A. Section 17-12a101, *et seq*. ("KUSA"). The KUSA establishes the public policy against retaliating or discharging employees who make complaints regarding potential securities and/or shareholder fraud.

61. It is against the public policy of the State of Kansas to discharge or in any way discriminate or retaliate against an employee who reports potential securities and/or shareholder fraud.

62. Defendant's retaliation and discharge of Plaintiff for reporting potential securities and/or shareholder fraud violates the public policy of the State of Kansas.

63. If allowed to go unremedied, Plaintiff's discharge would frustrate the well-recognized and defined public policy of the State of Kansas because it would have a chilling effect on employees' willingness to exercise their rights and would discourage employees from reporting potential securities and/or shareholder fraud.

64. Plaintiff's protected activities in complaining about potential securities and/or shareholder fraud were a determining factor in Defendant's decision to terminate her.

65. As a result of Defendant's acts and omissions, Plaintiff has in the past, and will in the future, suffer injuries and damages, including but not limited to mental and emotional distress, lost enjoyment of life, and lost wages, benefits and other emoluments of employment.

66. Plaintiff is entitled to an amount which will fully and fairly compensate her for her injuries and damages, punitive damages in amounts sufficient to punish Defendant and deter Defendant and others from similar conduct in the future, for pre-judgment and post-judgment interest, attorneys' fees, the costs and expenses of this action, and such other relief as may be just in the circumstances and consistent with the public policy of the State of Kansas.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count Two of her Complaint, for a finding that she has been subjected to unlawful retaliation in violation of the public policy of the State of Kansas*;* for an award of back pay, including lost fringe benefits, bonuses, costs of living increases and other benefits including interest; for an award of front pay in a reasonable amount; for an award of compensatory and punitive damages; for her costs expended; for her reasonable attorney's and expert witness fees; and for such other and further relief the Court deems just and proper.

**COUNT THREE – FMLA INTERFERENCE**

67. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

68. While employed by Defendant, Plaintiff qualified as an eligible employee under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA").

69. Plaintiff was entitled to the protections provided pursuant to the FMLA.

70. Plaintiff in good faith exercised her rights with Defendant under the FMLA to take leave related to her chest trauma.

71. Plaintiff in good faith requested FMLA qualifying leave from Defendant related to her chest trauma.

72. Defendant interfered with Plaintiff's exercise of her rights under the FMLA in violation of 29 U.S.C. § 2615(a)(1).

73. The adverse employment actions against Plaintiff occurred under circumstances raising a reasonable inference that her exercise of her rights under the FMLA was a motivating and/or determining factor in Defendant's decision to terminate Plaintiff's employment.

74. As a direct and proximate result of Defendant's actions and/or inaction, Plaintiff has been deprived of income and other monetary and non-monetary benefits.

75. As a further direct and proximate result of Defendant's actions and/or inaction, Plaintiff has suffered humiliation, emotional pain, distress, suffering, inconvenience, mental anguish, and related compensatory damages.

76. Defendant failed to make good faith efforts to enforce its policies to prevent interference with the FMLA-related rights of its employees, including Plaintiff.

77. Defendant's conduct was willful thereby entitling Plaintiff to an equal amount as liquidated damages and other appropriate equitable relief.

78. Plaintiff is also entitled to recover all of her costs, expenses, expert witness fees, and attorney's fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count Three of her Complaint, for a finding that Defendant interfered with Plaintiff's right to seek FMLA-related leave; for an award of back pay, including lost fringe benefits, bonuses, costs of living increases and other benefits including interest; for an award of front pay in a reasonable amount; for an award of compensatory and liquidated damages; equitable relief including reinstatement; for her costs expended; for her reasonable attorney's and expert witness fees provided by 42 U.S.C. § 2617(a)(3); and for such other and further relief the Court deems just and proper.

## COUNT FOUR – FMLA RETALIATION

79. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

80. Plaintiff was entitled to the protections provided pursuant to the FMLA.

81. Plaintiff in good faith exercised her rights with Defendants under the FMLA to take leave related to her chest trauma.

82. Plaintiff in good faith requested FMLA qualifying leave from Defendant related to her chest trauma.

83. Defendant retaliated against Plaintiff in the terms and conditions of her employment because of her request to utilize FMLA qualifying leave time, including in the termination of her employment in violation of 29 U.S.C. § 2615(a)(2).

84. Plaintiff's exercise of her rights under the FMLA was a motivating and/or determining factor in Defendants' decision to retaliate against Plaintiff and to terminate Plaintiff's employment.

85. Defendant failed to make good faith efforts to enforce its policies to prevent retaliation against its employees, including Plaintiff.

86. As a direct and proximate result of Defendant's actions and/or inaction, Plaintiff has been deprived of income and other monetary and non-monetary benefits.

87. As a further direct and proximate result of Defendant's actions and/or inaction, Plaintiff has suffered humiliation, emotional pain, distress, suffering, inconvenience, mental anguish, and related compensatory damages.

88. Defendant failed to make good faith efforts to enforce its policies to retaliation against individuals who exercise their FMLA-related rights, including Plaintiff.

89. Defendant's conduct was willful thereby entitling Plaintiff to an equal amount as liquidated damages and other appropriate equitable relief.

90. Plaintiff is also entitled to recover all of her costs, expenses, expert witness fees, and attorney's fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count Four of her Complaint, for a finding that Defendant retaliated against Plaintiff for the exercise of her rights under the FMLA; for an award of back pay, including lost fringe benefits, bonuses, costs of living increases and other benefits including interest; for an award of front pay in a reasonable amount; for an award of compensatory and liquidated damages; equitable relief including reinstatement; for her costs expended; for her reasonable attorney's and expert witness fees provided by 42 U.S.C. § 2617(a)(3); and for such other and further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to trial by jury.

## DESIGNATED TRIAL LOCATION

Pursuant to D. Kan. Rule 40.2, Plaintiff hereby designates the place of trial as **Kansas City, Kansas**.

Respectfully submitted,

LG LAW

/s/ Lewis M. Galloway

Lewis Galloway KS Bar No. 20172
1600 Genessee St Ste 918
Kansas City, MO 64102
Phone: (816) 442-7002
Fax: (816) 326-0820
lewis@lglawllc.com

ATTORNEY FOR PLAINTIFF